# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

———————————————————x
:
**DAVIS-STANDARD, LLC,**    : Case No.
                 **Plaintiff,**    :
                              :
v.                            :
                              :
**DONALD TEICH**              : December 3, 2013
**and SAM NORTH AMERICA, LLC,** :
                 **Defendants.**    :
                              :
———————————————————x

## COMPLAINT

Plaintiff Davis-Standard, LLC ("Davis-Standard"), by its attorneys Epstein Becker & Green, P.C., for its complaint, alleges as follows:

## NATURE OF THE ACTION

1.   This action asserts claims for equitable and injunctive relief, as well as money damages arising out of the breach by defendant Donald Teich ("Teich") of various contractual and common law duties owed to Davis-Standard in connection with Teich's employment at the company.   Teich resigned from Davis-Standard on or about November 14, 2013 and, upon information and belief, commenced employment on Monday, November 25, 2013 with defendant SAM North America, LLC ("SAM").   SAM is a direct competitor of Davis Standard in the liquid coating industry, and runs a facility just a few miles from Davis-Standard's facility where Teich worked.   Both such facilities are in Fulton, New York.

2.   In his Employment Agreement with Davis-Standard (a copy of which is attached as Exhibit A), Teich contracted, *inter alia*, to refrain from working for a competitor of Davis-Standard for a period of two years after termination of his employment at Davis-Standard. Teich's employment with SAM is in direct contravention of this non-compete provision.   Teich

FIRM:24229754v2

also contracted to safeguard the trade secrets and confidential information of Davis-Standard, and to refrain from soliciting employees, consultants and customers of Davis-Standard for a period of two years after termination of his employment at Davis-Standard.

3.   Davis-Standard's legitimate business interests are directly threatened by Teich's employment with SAM.  Teich was Davis-Standard's key and lead employee in its liquid coating business.

4.   Davis-Standard seeks an injunction from the Court and other equitable relief compelling Teich to abide by his applicable contractual and common law obligations to Davis-Standard, and further seeks damages to compensate Davis-Standard for the losses it has suffered. Teich received unique training and experience over nearly three decades of employment at Davis-Standard (and its predecessors) with regard to its liquid coating business, and because of this, and for other good and valuable consideration, Davis-Standard and Teich agreed to the two-year non-compete and non-solicit provisions in the Employment Agreement.  Teich was also extended the opportunity to become a stockholder of Davis-Standard's affiliate DS Parent, Inc. in exchange for his agreement to a one-year non-compete and non-solicit provisions in the DS Parent, Inc. Stockholders' Agreement.

5.   His intention to work now at SAM creates a real and unavoidable risk that trade secrets and confidential and proprietary information of Davis-Standard that Teich knows and possesses will inevitably be used by Teich and SAM to the commercial and competitive detriment of Davis-Standard.  In the absence of injunctive and equitable relief, Davis-Standard will suffer irreparable harm.

## PARTIES

6.   Plaintiff Davis-Standard is a Delaware limited liability company with its principal place of business located at 1 Extrusion Drive, Pawcatuck, Connecticut 06379.[1]

7.   Defendant Donald Teich is a citizen of the State of New York, and resides at 3290 Oak Brook Road, Baldwinsville, New York 13027.

8.   Defendant SAM North America, LLC is a limited liability company organized under the laws of the State of New York.  Upon information and belief, none of SAM's members are citizens of the State of Connecticut.

## VENUE, CHOICE OF LAW, AND JURISDICTION

9.   The Court has jurisdiction over this action pursuant to 28 U.S.C. §1332, because the matter in controversy exceeds the sum of $75,000, exclusive of costs and interest, and there is complete diversity of citizenship between the parties.

10. The Court has personal jurisdiction over Teich because he has consented to the jurisdiction of this Court in section 14(a) of his Employment Agreement that provides that "[v]enue and jurisdiction for any actions arising out of or relating to this agreement shall rest exclusively with Courts in New London County, Connecticut."

11. The Court has personal jurisdiction over SAM pursuant to Conn. Gen. Stat. 52 §59b because, upon information and belief, SAM transacts business within the state; and has committed a tortious act outside the state, as described herein, causing injury to Davis-Standard within the state, and regularly solicits business in the state, derives substantial revenue from

---

[1] Davis-Standard's sole member is Davis-Standard Holdings, Inc., a Delaware corporation with its principal place of business in Connecticut.  Davis-Standard Holdings, Inc. is owned by DS Parent, Inc., which also is a Delaware corporation with its principal place of business in Connecticut.

goods used in the state and from interstate and international commerce, and should reasonably expect the tortious act to have consequences in the state.

12. Venue properly lies in this Court pursuant to 28 U.S.C. §1391 because Davis-Standard operates a facility within this judicial district, and a substantial part of the events giving rise to the claims occurred in this judicial district.

## **BACKGROUND FACTS**

Davis-Standard's Business

13. Davis-Standard is a global leader in the design, development and manufacture of converting and extrusion systems, and process controls for the flexible web converting, plastics processing and rubber industries. Davis-Standard manufactures solution coating equipment, also known as "liquid coating" equipment, to service the flexible web converting industry. In addition, Davis-Standard supplies converting and extrusion systems for blown film, blow molding, cast film, compounding and pelletizing, elastomer, extrusion coating and laminating, fiber, laboratory, pipe, profile and tubing, reclaim, sheet, wire and cable, and wood fiber applications.

14. Davis-Standard designs, manufactures and sells liquid coating equipment systems which are painstakingly tailored to meet specific product requirements according to its customers' specifications and needs. Simply put, the liquid coating process is a means by which a substrate (which may be paper, film, fabrics, etc.) is unrolled, treated/coated with certain liquids, then dried and rolled up again. Its applications are found everywhere: for example, in tapes or labels, in silicone coating for adhesive packaging, in specialty coating for traffic signs and water-resistant fabrics, or in tinted acrylic plastics used to darken car and building windows. These systems can be anything from a complete standard coating line, to a new custom coating

line, or components like a coater head, dryer, winder, or unwinder that can be retrofit to the customer's existing coating equipment. Davis-Standard is a market leader in the technology and techniques of liquid coating.

Teich's Employment With Davis-Standard

15. Teich worked at Davis-Standard (and its predecessors Black Clawson Converting Machinery Inc., Black Clawson Converting Machinery LLC, and The Black Clawson Company) from January 1987 to November 14, 2013.

16. Teich was both a salesman and an executive at Davis-Standard, as well as a stockholder of DS Parent, Inc., and was well-compensated, earning a base salary of $137,500, plus $47,696.34 in commissions in 2012.

17. During the course of his employment at Davis-Standard and its predecessors, Teich held a number of positions, including Design Engineer, Senior Mechanical Designer, System Integration Specialist, Director Customer Support, Business Manager / Coating, and Product Manager / Coating.

18. Working in Davis-Standard's predecessors' liquid coating business, Teich took on the role as salesman in 2002, with the job title of District Sales Manager.

19. Donald Teich thereafter became Davis-Standard's key and lead employee in liquid coatings. Because of that, in 2012, he was given the title of Vice President for Liquid Coatings, responsible for providing leadership and direction to Davis-Standard's organizational resources such as technology, product management, operations, and procurement to develop and execute business strategy for that product.

Teich's Employment Agreement With Davis-Standard

20. On December 23, 2011, DS Parent, Inc. acquired Davis-Standard, investing in the company as part of the strategy to further expand Davis-Standard's global extrusion and converting systems businesses.

21. Paramount to the acquisition going forward was the need to protect the intellectual property of Davison-Standard, including that which was known and held by Teich.

22. As a result, through a sub-merger subsidiary, DS Parent, Inc. purchased Teich's stock in Davis-Standard Holdings, Inc. in 2011, in the amount of $157,251.67, plus provided Teich a gross-up payout of $28,051 in 2012, bridging the gap between the treatment of the stock payout as ordinary income versus capital gains, as consideration for Teich entering into an Agreement with Davis-Standard on or about January 6, 2012 (the "Employment Agreement"), which Employment Agreement contained certain restrictive covenants.

23. The gross-up payout was compensation that Teich was not otherwise entitled to and was specifically given to him in consideration for his signing of the Employment Agreement.

24. In addition, Davis-Standard offered to Teich the option to become an investor in and lender to DS Parent Inc. ("DS") by purchasing securities and funding promissory notes pursuant to a Securities Purchase Plan ("Plan"), and he invested $75,000 of his own money in the Plan.

25. By entering into the Employment Agreement, Davis-Standard and Teich agreed to certain non-competition, non-solicitation and confidentiality covenants, to protect Davis-Standard's legitimate business interests in its trade secrets and confidential information, its

customer relationships, and the investment that it made in Teich over the many years he was employed at Davis-Standard and its predecessors.

26. The non-competition covenant specifically provided that, for a period of two years following the termination of his employment, Teich would not "directly or indirectly, and whether as a principal or investor or as an employee, officer, director, manager, partner, consultant, agent, independent contractor or otherwise alone or in association with any other person, firm, corporation or other business organization, carry on a Competing Business in the United States; and [Teich would] not call on, solicit, take away, divert, attempt to divert or cause loss of any customer or prospective customer of [Davis-Standard]." A copy of the Employment Agreement is attached hereto as Exhibit A.

27. The Employment Agreement further provided that "[a] 'Competing Business' means [Teich] shall not perform or agree to perform services as an employee, officer, director, owner, partner, manager, agent, independent contractor or consultant for any business, practice, service or enterprise, wherever located, which develops, designs, manufactures, assembles, markets, sells, distributes, maintains, repairs, services, or conducts any other activities related to the extrusion and/or converting machinery business or any other business engaged in by Davis-Standard, LLC during the two-year period prior to the date of termination...."

28. The terms of this non-competition covenant were specifically negotiated and agreed to by Teich.

29. As a result, the covenant also contained a provision providing that Teich could voluntarily resign his employment and be released from the restrictive covenant if Davis-Standard elected to reduce its efforts in the liquid coating markets, provided certain conditions were met, including that Teich provide written notice detailing the company's shortcomings, and

that Davis-Standard fail "to develop and begin implementing a plan to cure the circumstances that gave rise to [Teich's] desire to terminate [his employment]."

30. The Employment Agreement also contains the following "Non-Disclosure or Confidential Information" provision:

> In the course of employment, Employees may have access to or receive confidential information. The success of the Employer depends to a substantial extent upon the maintenance of strict secrecy with respect to trade secrets and other Company confidential information. Such information would harm the Employer if known by our competitors or other non-Company employees.

> Accordingly, Employees may not at any time during and after termination of employment with Davis-Standard, LLC, use for any purpose or disclose any confidential information to any third person or party, except as specifically authorized in the course of employment and required for carrying out job duties. Under no circumstances shall confidential information be shared with, used for personal purposes, or shown to friends, family members or any third party either inside or outside of Davis-Standard, LLC either during or after employment. Likewise, it is important not to leave confidential information anywhere that a non-employee could see it or would allow easy unauthorized access to such information.

> Examples of confidential information include but are not limited to: ideas, techniques, product specifications, product innovations, intellectual property, marketing plans, business strategies, products, budgets, trade secrets, names or lists of customers, customer contract information, customer needs or special requirements, supplier lists, data relating to existing, past, or future customers or Employees of the Employer, personnel information, statistical data, financial data, profits, income, sales, technological innovations, credit files, computer hardware, computer software, strategic plans, methods of determination of prices, methods of operation, raw material sources and ideas developed by or for Davis-Standard, LLC, or any other data or information relating to the business Davis-Standard, LLC or which gives Davis-Standard, LLC a competitive advantage over others who do not know or have access to such information.

Donald Teich's Knowledge of Trade Secrets and Confidential and Proprietary Information

      31. After many years of experience, Donald Teich thereafter became Davis-Standard's key and lead employee in liquid coatings. Indeed, because of that, in 2012, he was promoted to become Vice President for Liquid Coatings, responsible for providing leadership and direction to Davis-Standard's organizational resources such as technology, product management, operations, and procurement to develop and execute business strategy for that product. Teich knows Davis-Standard's liquid coating business in its entirety, including its trade secrets and confidential information, its capabilities and strategies, the identities and needs of its existing and targeted customers, and the engineering underlying the business. Indeed, Teich was the author of Davis-Standard's 2012 and 2013 Strategic Plans for its liquid coatings business outlining the strategic focus for the company, identifying world-wide opportunities for growth, and assessing the strengths and limitations of Davis-Standard's liquid coatings line of business. Through his employment by Davis-Standard and his access to Davis-Standard's trade secrets and proprietary information, Teich knows the techniques, processes and equipment which work for specified customer applications and which do not. Davis-Standard's trade secrets and proprietary information have been developed over years of investment, research, development and trial and error applications, and have been painstakingly developed by Davis-Standard employees and others. All of Teich's knowledge and experience regarding liquid coating comes from his employment at Davis-Standard and its predecessors.

      32. Davis-Standard (including its predecessors) and Teich have been in the liquid coatings business for decades. As a market leader, the company specializes in the more challenging high-speed specialty liquid coating applications (including but not limited to the difficult process of coating substrates wider than 60 inches). As the former actual and de facto

head and product manager of Davis-Standard's liquid coatings business, Teich has intimate knowledge of the science and engineering of the liquid coating systems built and sold by Davis-Standard, including the empirical testing and trial-and-error that Davis-Standard has performed over the years. As a salesman of the equipment, Teich put that knowledge to use on a daily basis. He is uniquely qualified to understand both Davis-Standard's liquid coating products and its customers' needs, and to convince those customers that they can and should trust Davis-Standard to meet those needs.

Davis-Standard's Confidential and Protectable Customer Relationships

33. The liquid coatings systems which Davis-Standard designs, manufactures and sells are not standard off-the-shelf liquid coating systems. Rather, its entire business is based upon building relationships with its customers, and working closely with each customer to design, manufacture and sell highly customized liquid coating equipment that meets the customers' specifications and needs. Most often, Davis-Standard's customers come to the company seeking to manufacture a product that previously has not been manufactured. Davis-Standard's salesperson, with knowledge of Davis-Standard's technology and engineering capabilities, must understand what the customer wants to do, work with the customer to determine what specifications are required, and then work in tandem with the customer to develop the equipment needed. This commonly involves configuring the laboratory equipment at the Davis-Standard demonstration laboratory and testing such equipment over lengthy periods of time.

34. Because of his extensive experience at Davis-Standard and his encyclopedic knowledge of Davis-Standard's liquid coatings equipment, technology and engineering, Teich excelled in this sales and fulfillment process. The process involves a business development

cycle that usually takes two or three years (or more) from start to finish, culminating in the sale of the liquid coating equipment to the customer.

35. With respect to a number of Davis-Standard's customers, Teich was Davis-Standard's primary customer relationship contact point.

36. Davis-Standard also has a unique customer list, which includes not only the identity of those customers but also the confidential product plans, preferences and specifications of those customers. Indeed, the very fact that certain customers are talking to and/or working with Davis-Standard is confidential and those customer relationships are governed by non-disclosure agreements. In many cases, customers are relying on Davis-Standard to design and manufacture liquid coating equipment that will produce a more competitive product, thereby giving those customers a competitive advantage in their respective industries. Teich has intimate knowledge of all of Davis-Standard's liquid coating customers and prospective customers (and also the customers and prospective customers of Davis-Standard's other businesses), including their plans, needs and specifications, by virtue of his responsibilities as Davis-Standard's lead liquid coating salesperson, his years of experience at the company and by his participation in weekly sales teleconferences in which Davis-Standard personnel review and discuss those customers and prospects in all Davis-Standard businesses. Teich's knowledge thus extends beyond liquid coatings into other areas (for example, into extrusion coating and cast film) in which SAM also competes with Davis-Standard.

Teich Was A Unique Employee At Davis-Standard

37. Teich was truly an employee with unique expertise at Davis-Standard. His skill-set is virtually unparalleled in the liquid coating industry. He led Davis-Standard's team in the sales process as well as the technical/specifications process of its liquid coating business.

Teich was Davis-Standard's lead person at coating and drying trade shows. Because of his skills and knowledge, he always engaged in focused and intelligent discussions with customers regarding the customization of liquid coating equipment. Because of his broad and lengthy experience developed through his employment by Davis-Standard (and its predecessors) and his access to its trade secrets and proprietary information, Teich knows which specifications are feasible and which are not. He could relay those specifications to Davis-Standard's engineers so that they understand what must go into building the equipment. He worked in the lab with the customers to refine the equipment they seek. The different methods of applying coatings to the customers' substrate are highly secret and proprietary to Davis-Standard, and Teich knows all about them. Teich was also invaluable during the oven-drying step in the liquid coating process (oven-drying of coatings thus applied, which are performed by Davis-Standard's vendors through laboratory trials, about which Teich was fully conversant and able to make recommendations to customers). Finally, Teich could finalize the sale of the customized equipment. Teich will be extraordinarily difficult for Davis-Standard to replace.

38. Davis-Standard has begun the process of trying to hire a replacement for Teich. Even when a particular person is hired to Teich's prior position, however, it will be years before that person has the comprehensive knowledge of the liquid coating business and relationships with customers that Teich currently possesses.

39. For all of these reasons, Davis-Standard agreed with Teich to certain non-competition and non-solicitation covenants, to protect its legitimate business interests in its trade secrets and confidential information, its customer relationships, and the investment that it made in Teich over the many years he was employed at Davis-Standard and its predecessors.

<u>Teich Will Inevitably Disclose Davis-Standard's Confidential Information to His New Employer</u>

40. Davis-Standard competes with only a small number of liquid coatings businesses established in North America. One such competitor is SAM North America LLC ("SAM"), where, upon information and belief, Teich commenced employment on Monday, November 25, 2013. Upon information and belief, SAM is a subsidiary of a South Korean company, and it opened a facility in Fulton, New York, just a few miles from Davis-Standard's long-established facility in Fulton, New York in or around 2010.

41. Teich's knowledge is extremely valuable and will provide a competitive advantage to SAM. Davis-Standard has perfected technologies and has built a customer base that its competitors, including SAM, would greatly profit from having. The liquid coating systems that Davis-Standard engineers are all custom made and refined over time for the specific needs of each of its customers. SAM is in the same business -- building and selling customized liquid coating equipment according to its customers' needs and specifications.

42. Acquired and honed over decades of employment at Davis-Standard (and its predecessors), Teich's specialized knowledge of Davis-Standard's trade secrets and confidential information, including its customer relationships, is directly applicable and invaluable to SAM's liquid coating business and will inevitably be disclosed to SAM if Teich is permitted to work there as Vice President Sales – South America.

43. As discussed above, Davis-Standard and SAM are direct competitors in the liquid coating industry. By employing Teich, SAM (which is relatively new to liquid coating when compared to Davis-Standard's decades of experience in the business) gains a world of knowledge of Davis-Standard's liquid coating processes, research and development, as well as access through Teich to confidential customer information, relationships, and history of

equipment purchases.  With Teich, SAM will be able to short-cut many of the efforts that Davis-Standard has had to undertake to get to its current market position, to the direct detriment of Davis-Standard.

44. To analogize, if Davis-Standard is the Coca-Cola (*i.e.*, the market leader) of the liquid coating industry, SAM is the industry's fierce upstart competitor whose business will be helped immeasurably by hiring away a key employee from Coca-Cola, who knows, and was instrumental in creating, the secret formulas of its products.  Teich is that employee.

45. On November 22, 2013, Teich advised Davis-Standard that he is now employed by SAM and holds the position of Vice President Sales – South America, and that his role is presently contemplated to include providing sales and support to SAM's gravure printing products in North and South America.

46. Notwithstanding his title and role, Teich will not be able to cordon off his technical and strategic knowledge of Davis-Standard's liquid coating business in working at SAM.  Moreover, SAM's customers with gravure printing needs also have extrusion and liquid coating needs.  The idea that Teich can stop himself from drawing upon and disclosing Davis-Standard's trade secret and confidential information while working at SAM is far-fetched indeed.

Teich Becomes a Stockholder of DS Parent, Inc.

47. On or about January 27, 2012, Teich was offered the option to become an investor in and lender to DS Parent, Inc. by purchasing securities and funding promissory notes pursuant to a Securities Purchase Plan ("Plan").

48. For purposes of the Plan, Teich was considered a "Management Stockholder" of DS Parent, Inc., and he invested $75,000 of his own money in the Plan.  In doing so, Teich

became a party to the Stockholders' Agreement, which contained, among others, separate non-competition and non-solicitation provisions.

Teich's Resignation From Davis-Standard and Commencement of Employment With SAM

49. By letter, dated October 14, 2013, Teich provided notice to Davis-Standard that he was voluntarily resigning his employment and, pursuant to paragraph 5 of his Employment Agreement, arguing that Davis-Standard had failed to meet with "performance and support conditions" with respect to the liquid coating business, and therefore could not insist upon Teich's compliance with the two-year non-competition provision contained in the Employment Agreement.

50. Davis-Standard responded with both a face-to-face meeting on October 28, 2013, between Teich and Bob Florence, Executive Vice President, Global Sales and Marketing, and a letter from Stephen P.H. Rachlis, Vice President, General Counsel, to Teich, dated October 29, 2013, specifically refuting his claims set forth in his October 14, 2013 letter that, *inter alia*, Davis-Standard had elected to reduce its efforts in liquid coating and that none of Teich's recommendations to improve the business had been implemented, and specifically demonstrating that Davis-Standard was, and indeed had been, addressing Teich's concerns and recommendations.  In that October 29, 2013 letter, Davis-Standard also reminded Teich that he was subject to the one-year non-competition provision in the Stockholders' Agreement.

51. By letter, dated November 14, 2013, Teich argued that Davis-Standard had failed to develop and begin implementing a plan to cure the alleged circumstances that gave rise to his desire to terminate his employment, and that therefore not only was Teich resigning effective immediately, he was also released from any non-competition and non-solicitation obligations contained in the Employment Agreement.  He also denied that he had ever seen the Stockholders' Agreement and argued that he was not bound by it.

52. On Friday, November 22, 2013, Teich disclosed for the first time to Davis-Standard that he had accepted employment with SAM and intended to begin working there on Monday, November 25, 2013 with the title of Vice President Sales – South America.

53. On that same day (November 22, 2013), Teich filed a lawsuit entitled *Donald Teich v. Davis-Standard, LLC*, Index No. 2013-6184, in the Supreme Court of the State of New York, Onondaga County, in which he sought a declaratory judgment that the restrictions on competition contained in the Employment Agreement and the Stockholders' Agreement are not enforceable as against Teich.

<u>SAM's Tortious Interference With Teich's Contractual Obligations to Davis-Standard</u>

54. On November 27, 2013, Bob Preston, Chief Executive Officer of Davis-Standard, sent a letter to the Chairman of the Board of SAM's South Korean parent company, advising SAM that Teich was violating his contractual non-competition and non-solicitation obligations to Davis-Standard by being employed at SAM.

55. Despite receiving such letter, SAM has not changed its position and still is employing Teich.

56. Faced with these breaches and unfair competition by Teich and SAM, Davis-Standard's remedies at law are inadequate.

<u>Statement Regarding Related Litigation</u>

57. Davis-Standard has filed this litigation in this Court because the Employment Agreement (in section 14(a)) provides that "[v]enue and jurisdiction for any actions arising out of or relating to this agreement shall rest exclusively with Courts in New London County, Connecticut."

58. In addition to this litigation filed by Davis-Standard, which seeks to enforce the Employment Agreement with Teich, Davis-Standard's parent company, DS Parent, Inc. is

commencing a lawsuit contemporaneously in the United States District Court for the Northern District of New York against Teich and SAM, to enforce its Stockholders' Agreement with Teich. That Stockholders' Agreement (in section 13(n)) provides, with respect to jurisdiction and venue, that each of the parties "consents to submit itself to the personal jurisdiction of the United States District Court for the State of New York or the other courts of the State of New York, in each case in connection with any dispute arising out of, in connection with, in respect of, or in any way relating to this Agreement."

59. Because the Stockholders Agreement and the Employment Agreement contain conflicting jurisdictional provisions, the filing of a separate litigation was required.

**FIRST CAUSE OF ACTION**
**<u>(Breach of Contract Against Teich)</u>**

60. Davis-Standard repeats and realleges the allegations set forth in paragraphs 1 through 59 as if fully set forth herein.

61. Teich signed the Employment Agreement and therefore is bound by its terms.

62. The Employment Agreement is enforceable and imposes upon Teich certain contractual obligations.

63. Davis-Standard fully performed its obligations to Teich pursuant to the Employment Agreement.

64. By his actions described above, including his work for SAM, a competitor of Davis-Standard, Teich breached his Employment Agreement, resulting in harm to Davis-Standard.

65. Such breach was intentional and/or reckless.

66. If Teich is not enjoined from violating the non-competition and non-solicitation provisions of the Employment Agreement, Davis-Standard will be irreparably

harmed inasmuch as Teich will make use of and/or disclose Davis-Standard's trade secrets and other confidential and proprietary information while working for SAM.

67. By virtue of the foregoing, Teich is liable to Davis-Standard for substantial monetary damages, in an amount to be determined at trial but the total of which is believed to be in excess of $75,000, as well as monetary damages that cannot be calculated, and irreparable harm to its business, reputation and goodwill.

**SECOND CAUSE OF ACTION**
**(CUTSA Claim Against Teich)**

68. Davis-Standard repeats and realleges the allegations set forth in paragraphs 1 through 67 as if fully set forth herein.

69. Davis-Standard possesses certain trade secrets and confidential information with which Teich is familiar, and which Teich has a duty not to disclose outside of Davis-Standard.

70. Davis-Standard has expended substantial resources in developing and safeguarding its trade secrets for its exclusive benefit, and the information provides Davis-Standard with an advantage over its competitors.  These trade secrets derive independent economic value from the fact that they are neither generally known nor readily ascertainable by proper means by Davis-Standard's competitors, customers and others.

71. Teich gained knowledge of these trade secrets by virtue of his employment with Davis-Standard.

72. Teich has used and continues to use these trade secrets for his own benefit or for the benefit of Davis-Standard's competitor(s) in violation of his obligations to Davis-Standard.

73. Teich's use and/or dissemination of this trade secret information constitute a misappropriation of Davis-Standard's trade secrets.

74. As long as Teich is employed at SAM, he will inevitably use and/or disclose the trade secrets of Davis-Standard for the benefit of himself and SAM.

75. As an unavoidable result of Teich's present and/or impending misappropriation of these trade secrets, Davis-Standard will be irreparably harmed.

76. By virtue of the foregoing, Teich is liable to Davis-Standard for substantial monetary damages, in an amount to be determined at trial but the total of which is believed to be in excess of $75,000, as well as monetary damages that cannot be calculated, and irreparable harm to its business, reputation and goodwill.

## THIRD CAUSE OF ACTION
### (Tortious Interference With Contract Against SAM)

77. Davis-Standard repeats and re-alleges the allegations made in paragraphs 1 through 76 above as if fully set forth herein.

78. On information and belief, at all times relevant hereto, SAM had knowledge of the Employment Agreement and acted with full knowledge thereof.

79. The Employment Agreement between Davis-Standard and Teich is a valid contract and Davis-Standard complied with the terms of that Employment Agreement.

80. By virtue of SAM's conduct in hiring Teich, SAM interfered with and instigated Teich's breach of that Employment Agreement, without justification.

81. By virtue of its conduct, SAM knowingly, intentionally, and maliciously sought to harm Davis-Standard.

82. As a result of SAM's interference with this Employment Agreement, Davis-Standard has been and continues to be irreparably harmed.

83. By virtue of the foregoing, Teich is liable to Davis-Standard for substantial monetary damages, in an amount to be determined at trial but the total of which is believed to be in excess of $75,000, as well as monetary damages that cannot be calculated, and irreparable harm to its business, reputation and goodwill.

**FOURTH CAUSE OF ACTION**
**(CUTPA Claim Against SAM and Teich)**

84. Davis-Standard repeats and re-alleges the allegations made in paragraphs 1 through 83 above as if fully set forth herein.

85. Rather than build their own business by investing the time and capital necessary to do so, SAM and Teich decided to join together to build and expand SAM's business by using Teich's knowledge, and trade secrets and confidential information gained from Davis-Standard.

86. By virtue of the foregoing, Teich and SAM have engaged in unfair and deceptive acts and trade practices and continue to compete unfairly with Davis-Standard, seeking to reap what they have not sown.

87. The unfair and deceptive acts and trade practices include Teich's misappropriation and disclosure, and SAM's use, of Davis-Standard's trade secrets and confidential and proprietary information in competition Davis-Standard, to the material detriment of Davis-Standard, for SAM and Teich's own benefit.

88. Such unfair and deceptive acts and trade practices are illegal, immoral, unethical, oppressive and/or unscrupulous and offend public policy in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §42-110a-q.

89. As a result of defendants' unfair and deceptive acts and trade practices, Davis-Standard has been and continues to be irreparably harmed.

90. Defendants' unfair and deceptive acts and trade practices has caused, and will continue to cause, Davis-Standard to suffer substantial monetary damages, in an amount to be determined at trial but the total of which is believed to be in excess of $75,000, as well as monetary damages that cannot be calculated, and irreparable harm to its business, reputation and goodwill.   Defendants are liable to Davis-Standard for the damages caused by their unfair competition.

91. A copy of this Complaint will be mailed to the Attorney General of Connecticut pursuant to Conn. Gen. Stat. §42-110g(c).

### FIFTH CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith and Fair Dealing Against Teich)

92. Davis-Standard repeats and realleges the allegations set forth in paragraphs 1 through 91 as if fully set forth herein.

93. Teich signed the Employment Agreement and therefore is bound by its terms.

94. The Employment Agreement is enforceable and imposes upon Teich certain contractual obligations.

95. Davis-Standard fully performed its obligations to Teich pursuant to the Employment Agreement.

96. By his actions described above, including his work for SAM, a competitor of Davis-Standard, Teich breached his Employment Agreement, resulting in harm to Davis-Standard.

97. Davis-Standard expected that Teich would use his best efforts to maintain the secrecy of its trade secrets and to provide services of the highest quality to their clients.

98. Instead, Teich undertook actions that served to undermine Davis-Standard's business.

99. In so doing, Teich acted in bad faith.

100. If Teich is not enjoined from violating the non-competition and non-solicitation provisions of the Employment Agreement, Davis-Standard will be irreparably harmed inasmuch as Teich will make use of and/or disclose Davis-Standard's trade secrets and other confidential and proprietary information while working for SAM.

101. By virtue of the foregoing, Teich is liable to Davis-Standard for substantial monetary damages, in an amount to be determined at trial but the total of which is believed to be in excess of $75,000, as well as monetary damages that cannot be calculated, and irreparable harm to its business, reputation and goodwill.

WHEREFORE, plaintiff Davis-Standard respectfully demands that this Court preliminarily and permanently enjoin defendants Donald Teich and SAM North America, LLC from continuing their unlawful activities described above, as follows:

(a) Enjoining Teich from directly or indirectly working for or rendering services to SAM or anyone whose primary business is the design, manufacture, sales, installation and support of (i) extrusion machinery and systems (including plastics recycling and reclamation systems and laboratory equipment) for rubber and plastics industries, and/or (ii) converting machinery and systems for the film, pelletizing, blow molding, extrusion coating and liquid coating industries;

(b) Enjoining Teich from, directly or indirectly, for a period of two years following the termination of his employment: (1) inducing or attempting to induce any individual who is an employee or independent contractor of Davis-Standard to leave the employ or service, as applicable, of such entity, or in

any way knowingly interfering with the relationship between Davis-Standard, on the one hand, and any such employee or independent contractor thereof, on the other hand, or (2) hiring any person who is an employee of Davis-Standard;

(c) Enjoining Teich from directly or indirectly influencing or attempting to influence customers, vendors, suppliers, licensors, lessors, joint venturers, associates, consultants, agents, partners or prospective customers of Davis-Standard to divert their business away from Davis-Standard, or otherwise interfering with, disrupting or attempting to disrupt such business relationships, contractual or otherwise;

(d) Enjoining each defendant from copying or reproducing for defendants' use or giving, divulging, revealing, or otherwise disclosing to any person or business or professional entity, any trade secrets or confidential business information of Davis-Standard, or any client, and requiring that each defendant return all copies of such trade secrets and confidential business information; and

(e) Granting such other, further or different relief as this Court may deem proper; and also respectfully demands that the Court issue judgment against the defendant as follows:

  (1) awarding Davis-Standard compensatory damages in an amount to be determined at trial, together with pre-judgment interest;

  (2) awarding statutory damages pursuant to Conn. Gen. Stat. 42-110g(a), including double damages, costs and attorneys' fees;

(3) awarding Davis-Standard such other costs and attorneys' fees reasonably incurred in connection with this proceeding; and

(4) granting Davis-Standard such other and further relief as may be just and proper.

**PLAINTIFF,**
**DAVIS-STANDARD, LLC**


By: _____

Matthew T. Miklave, Esq. (ct28261)
David J. Clark, Esq. (ct21675)
Dean R. Singewald II, Esq. (ct16708)
**EPSTEIN BECKER & GREEN, P.C.**
250 Park Avenue
New York, New York 10177
(212) 351-4500
mmiklave@ebglaw.com
dclark@ebglaw.com
dsingewald@ebglaw.com
Its Attorneys